Braughler, Appellant, *v.* Commonwealth.

Argued March 20, 1957.   Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD and JONES, JJ.

574

Lee C. McCandless, with him James L. Jack, Jr., for appellants.

G. S. Parnell, Sr., with him G. S. Parnell, Jr., and Parnell & Parnell, Special Counsel, John R. Rezzolla, Chief Counsel, Joseph L. Donnelly, Deputy Attorney General, and Thomas D. McBride, Attorney General, for appellees.

OPINION BY MR. JUSTICE CHIDSEY, April 26, 1957:

This is an appeal from the grant of a new trial in an eminent domain proceeding.

On January 23, 1951 the Governor of the Commonwealth approved plans for the relocation of State Highway Route 80 which traversed the appellants' property in Rayne Township, Indiana County. The relocated highway extended through appellants' property for a distance of 1,375 feet. Both the old and the new highway ran along a steep hillside on the eastern portion of the appellants' property. The right-of-way taken for the relocation was 100 feet in width but because of slopes and fills additional land, varying from 75 to 106 feet in width had to be taken at points on the sides. The total area taken was 4.3 acres. Appellants' property was farmland, consisting of between 57 and 58 acres, with a house, barn and other structures erected thereon. The appellant Darhl K. Braughler was in the

business of portable feed grinding, going from farm to farm in this pursuit. In addition to living on the property here involved, Braughler testified that he used it for farming and raising Christmas trees. Appellants purchased the farm from one James Rising for $6,000 on October 23, 1950, just three months before the condemnation on January 23, 1951. When the matter was before the board of viewers they determined that the damages to the appellants amounted to $2,-375. On appeal, the issue was tried before a jury and a verdict was rendered in the amount of $6,000. The court below regarding the verdict as excessive and against the weight of the evidence, entered an order that if appellants would file a disclaimer and remit all of the verdict over and above $4,500, a new trial would be refused; otherwise a new trial would be awarded. Appellants refused to file a remittitur and the court granted a new trial. This appeal followed. The only question presented by the appeal is whether the court below palpably abused its discretion in granting a new trial on the ground that the verdict was against the weight of the evidence.

The court below charged the jury: ". . . the measure of damages is the difference between the fair market value of that farm out there before the State took this land, which was on January 23, 1951, and the fair market value after they took the land. The difference between the fair market value before and the fair market value after, that is the measure of damages. Now to that, as has been said here, you can also add, and you are permitted to add, an amount for the delay in the payment of that amount, and that amount which you add cannot exceed 6% interest per year. . . .". No complaint is made of this instruction.

On behalf of the owners of the land opinions were given by the appellant, Darhl K. Braughler, by a neigh-

bor, Lyle Helman who owned a farm on Route 80 about a mile from appellants' property and who had a similar claim pending against the Commonwealth, by Brook Braughler, the father of the appellant, and by Allen P. Hovis and Charles Mears. The latter three owned farms in the vicinity and based their opinion as to the value of appellants' property before the taking on their familiarity with it. With the exception of Helman who testified that he bought a property about a mile from that of appellants without stating when or at what price, and without any description of it, neither appellant Braughler nor his witnesses testified as to any sales of property in the vicinity. Tabulated, the opinions of these witnesses as to the fair value of appellants' property before and after the taking and the difference, representing the damages thereto sustained by appellants, is as follows:

|  | Before | After | Damages |
|---|---|---|---|
| Darhl K. Braughler | $11,500 to 12,000 | $1,000 to 1,500 | $10,000 |
| Lyle Helman | 11,000 | 2,500 | 8,500 |
| Brook Braughler | 10,000 | 2,500 to 3,000 | 7,000 |
| Allen P. Hovis | 10,500 | 3,500 | 7,000 |
| Charles Mears | 10,000 | 3,000 | 7,000 |

On behalf of the Commonwealth opinions were given as follows:

|  | Before | After | Damages |
|---|---|---|---|
| Ellsworth Walls | $ 6,500 | $4,750 | $ 1,750 |
| Turner B. Streams | 6,000 | 4,800 | 1,200 |

The witness Streams was an experienced appraiser of property and testified that he had knowledge of sales and purchases of farms in Indiana County. Walls was a licensed real estate broker who testified that he was acquainted with the appellants' property, the value of properties in the vicinity, and had handled

sales of property in Rayne Township. He further testified that in February or March of 1950 James Rising from whom the Braughlers purchased their property in October of that year, had placed the property with his concern, known as Walls-Hill Real Estate, consisting of himself and two salesmen, for sale at $6,500; that every effort was made to sell the property at this price by advertising, word of mouth and personal contact with different people, but no one was found willing to pay that price for it. This employment of the Walls-Hill agency to sell the property for $6,500 which Walls stated was in writing, was not contradicted.

It will be seen that the damages fixed by appellants' witnesses ranging from $7,000 to $10,000 were predicated upon values placed upon the property of from $4,000 to $6,000 in excess of the purchase price of $6,000 paid by the appellants only three months before the taking. There was no evidence that any improvements had been made to the property during this period of three months or that the general character of the neighborhood had in any way changed. While the purchase price paid by the owners of land may be of little or no relevancy in condemnation proceedings where the land was acquired a considerable time before the condemnation and it has been improved or a change has occurred in the character of the neighborhood (see *Young v. Upper Yoder Township School District*, 383 Pa. 320, 324, 118 A. 2d 440), or where there is a showing that the purchase price was not an "arm's length" valuation arrived at in the open market, none of these factors appear here.

In support of the diminished value of the property occasioned by the taking of the 4.3 acres, appellants claimed specific items of damage. A loss of water supplied by a spring was claimed. This spring was located in that portion of the land condemned over which

the highway and its berms was located. The spring was preserved under the highway by encasement in a concrete box, with walls of eight-inch concrete with reinforced top, proper drains and an outlet pipe leading to appellants' land. This protected the spring from surface water and contamination to which it was theretofore subjected. Appellant Braughler testified that after the reconstruction, the water was "not good". No analysis of the water was offered to support this statement. It appeared that during the relocation of the road a barrel of oil had upset and Braughler claimed that this made the water oily. It is not clear that he was referring to water from the spring or from another source of water supply which existed on the farm. However, it was testified that the oily condition was a temporary one which cleared up. Braughler testified that the spring was destroyed and that he had spent $889.92 in drilling and equiping a well as a new source of water supply. The testimony indicated that water still flowed from the spring as before the taking. Appellants also claimed that 1½ acres between the old and new road and another 25 were rendered inaccessible, and 5 acres rendered swampy and useless for farming purposes. This testimony was met by evidence adduced on behalf of the Commonwealth that there was less drainage upon the 5 acres because of diversion of some of the theretofore existing drainage to land not owned by appellants. Testimony was also adduced in contradiction of the inaccessibility claimed as to the acreage above mentioned. Incidentally, it may be observed that this acreage consisted of hilly terrain and of questionable adaptability to agricultural use. Appellants also claimed damages for a very large number of trees destroyed in the taking. There was no evidence denying that the trees were destroyed, although their value was disputed by the Commonwealth.

We have set forth these items of specific damages claimed to have resulted because much emphasis was placed thereon by the appellants. We have thoroughly reviewed the record and are convinced that appellants failed to establish that they were damaged with respect to water supply from the spring. Conceding that the conflict in testimony as to the other specific items of damage was for the jury's determination in fixing the value of the farm after the taking, and assuming that the jury found that appellants were deprived of the use of some acreage as claimed by appellants, the fact remains that after the taking appellants still had the major portion of the farm—the remaining and apparently better acreage together with the house, barn, wagon shed, chicken house and corn crib erected thereon, and, by the jury's verdict of $6,000 the appellants would receive, after making some allowances for inclusion therein of damages for detention, substantially the amount which they paid for the property.

In its opinion the court said: ". . . While this Court in its charge tried to impress upon the jury there was but one measure of damages it is the opinion of this Court that the jury must have either added certain specific damages which were shown, or fixed the value of this property at a value away beyond what this Court believes the fair weight of the evidence shows the property was actually worth prior to the taking of the property. This Court is of the opinion that the verdict was against the weight of the evidence that substantial justice requires that a new trial be granted unless the plaintiffs are willing to remit a part of the money which was allowed them by the verdict. . . .". The court also stated that it was impossible for it to believe that the value of the property between the time it was sold to the Braughlers or was in the hands of Mr. Walls, the real estate agent, would increase in

value in three months to the extent claimed by appellants.

The measure of damages to an owner's property in a condemnation proceeding is the difference in its value before and after the taking. It is a simple arithmetic matter of subtraction, but the burden of proof by the fair weight or preponderance of the evidence, to establish the factors necessary to make the subtraction is upon the land owner. Assuming arguendo that there was credible evidence in the instant case for the jury to arrive at the subtrahend, that is the value after the taking claimed by appellants, we think the court was fully justified in finding that there was no credible evidence supporting the minuend, that is the value before the taking claimed by appellants. While ordinarily the jury is given wide latitude in arriving at valuations and ascertaining damages, a finding that a farm valued in the market at $6,000 only three months earlier becomes almost worthless when only a part of it is taken or damaged leaving a substantial acreage on which the farmhouse, barn and other farm buildings are located, should not be allowed to stand.

Appellants principally rely upon the case of *Crumrine v. Washington County Housing Authority*, 376 Pa. 234, 101 A. 2d 676, where we reversed the grant of a new trial in a condemnation proceeding. The case is clearly distinguishable. There the court did not, as here, find that the verdict was against the weight of the evidence or question the credibility of the plaintiff's witnesses; on the contrary it stated that it could not say " 'that the verdict is contrary to or not supported by evidence' ", and apparently "picked out of the air" a suggested verdict to serve as a base for the parties " 'to arrive at an adjustment' ". In *Avins v. Commonwealth*, 379 Pa. 202, 108 A. 2d 788, cited by appellants as an instance where the award of a new

trial was reversed, the trial judge who tried the case without a jury disregarded all of the evidence as to property values and substituted his own personal opinion for the evidence in making the award appealed from. This, as pointed out in Mr. Justice JONES' opinion, was clear error. In the instant case the court not only considered the evidence adduced but had before it the undisputed established facts that appellants had purchased the property shortly before the taking for $6,000 and that it was for sale with no takers prior to the time of its purchase for $6,500.

We have held in many cases that where the testimony is conflicting, the verdict of the jury will be upheld, but in no case have we reversed the grant of a new trial where we are satisfied that the court below was justified in finding that the evidence adduced by the verdict-winner was unworthy of belief. We have repeatedly held that an appellate court will not reverse an order granting or refusing a new trial unless a palpable abuse of discretion appears. We find no such abuse of discretion in the instant case.

Order affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On October 23, 1950, Darhl K. Braughler and Ruby Braughler, his wife, purchased in Rayne Township, Indiana County, a farm containing 57 acres. On January 23, 1951, the Commonwealth condemned certain parts of this land for the purpose of highway construction. When the Board of Viewers allowed the property-owners only $2,375 in damages for the taking, they appealed to the Court of Common Pleas, and, in the ensuing trial, the jury returned a verdict of $6,000. The Trial Judge ordered a new trial unless the plaintiffs agreed to accept only $4,500 in complete settlement of

their claims. The plaintiffs refused the reduction and appealed to this Court.

The Majority of this Court has affirmed the order of the Court below and I regret that I am not equipped with an X-ray device which permits me to discern what the Majority perceives quite readily, namely, that $6,000 is too much money for the damages suffered by the plaintiffs and that $4,500 is just enough. The jury saw the witnesses, heard the testimony, they were inhabitants of the same county in which the farmland was located, they were familiar with local conditions, they were properly instructed on the law and after due deliberation they concluded that the plaintiffs were entitled to $6,000. But this Court, which did not see the witnesses and did not visit the locale involved, declares with the precision of a surveyor that what the plaintiffs lost in damages was not $6,000 but $4,500. It is to be noted that the $6,000 verdict includes retention money at a potential interest rate of 6% for five years and two months so that the actual amount of damages assigned to the plaintiffs by the jury was probably at least $1,000 less than $6,000. In another trial the next jury may well return a verdict not far removed from the amount of the last verdict, especially when the Trial Court and this Court admit that the plaintiffs are entitled to at least $4,500. Why, then, should the plaintiffs, two farmers living in a remote area, be subjected to all the trouble, expense, annoyance, travel, and anguish of another trial when there is no assurance whatever that the result of the new trial will not be the same as the old one? In fact, without claiming any gift of prophecy, I would say that there is far greater likelihood that the verdict will be closer to $6,000 than $4,500.

It is not claimed by anyone that there was error in the former trial: the Judge charged correctly, the

lawyers were impeccable, the jurors equally so. Why must there be a repeat performance? $1500 is a substantial sum, but is it enough to justify the enormous labors which need to be performed in order to eliminate it, when every modest prognostication assures a verdict approximating the one already recorded?

Although it did not say so in so many words, the lower Court based its order for a new trial on the proposition that if it had been sitting as a jury, it would have returned a verdict for $4,500 instead of $6,000, but is that a reason for a new trial? In *Wilson v. Kallenbach*, 332 Pa. 253, 255, this Court said: "It is well settled that a new trial will not be granted because of a mere conflict in testimony: Kennelly v. Waropoyak, 266 Pa. 94; Harmer v. American Ry. Exp. Co., 269 Pa. 271; or because the trial judge on the same facts would have arrived at a different conclusion: Donnelly v. Penna. Co., 252 Pa. 175."

But there is another reason why a retrial of this case works an injustice. A reading and re-reading of the Opinion suggests to me that its views differ from mine not because I am lacking in the X-ray device heretofore mentioned, but because the Majority adopts premises which are not acceptable. The plaintiffs' witnesses, testifying to the value of the farmland in controversy, stated that it was worth from $10,000 to $12,000 prior to the taking, and that it was worth from $1,000 to $3,500 after the taking, thus leaving to the plaintiffs a margin of damages running from $6,500 to $11,000. The majority Opinion emphasizes that since the Braughlers had bought the property in October, 1950 for $6,000, it could not be worth any more than $6,000, or possibly $6,500, at the time of the taking three months later, because it had not in that time been improved. This proposition of the Majority would suggest that it believes purchase price always to be

synonymous with market price. Of course, that is not so. Very often it is not. Quite frequently properties are sold for specific reasons which advantage the seller or the buyer, or both, entirely unrelated to market value which, after all, is but an arbitrary appraisement built on the fanciful state of indolence and *laissez faire* where the seller, in slow motion, is not particularly eager to sell and the purchaser, with equal lassitude, is in no hurry to buy.

The Majority Opinion completely ignores the possibility that the Braughlers may have acquired a bargain when they purchased their farm. In fact, Mr. Braughler testified to that effect. Thus, if the plaintiffs bought the farm in controversy at a price less than what it would have brought on the open market, what right does the Commonwealth have to seize that profit? Is it an offense to trade at a profit? Is there anything wrong about descending into the bargain basement and picking up a value which might have escaped the eyes of others? And if the Braughlers bought a $10,000 piece of real estate for $6,000, should they be penalized $4,000 at the outset, when they seek compensation for damage done to that property through no fault of their own?

The Majority errs in the fundamental premise just indicated, but it goes on to compound that error by reading the testimony either through glasses which distort what is plainly written or through spectacles not ground to the prescription which declares that testimony which is under review by an appellate court is to be read, especially when it is conflicting, in the light most favorable to the verdict-winner. (*Geyer v. Thomas*, 364 Pa. 242.)

The Majority says that the property could not have been worth more than $6,000 or $6,500 prior to the taking, because the defendant's witnesses so stated.

But the jury did *not* accept the figures testified to by the defendant's witnesses, and they did believe the figures presented by the plaintiffs' witnesses.

The Majority places a faith in the defendant's real estate experts, Walls and Streams, which the record does not justify for me. Of Turner B. Streams, the Majority says: "The witness Streams was an experienced appraiser of property and testified that he had knowledge of sales and purchases of farms in Indiana County." Streams may have been an "experienced appraiser of property" and may have "had knowledge of sales and purchases of farms in Indiana County," but he was singularly deficient in knowledge so far as the subject matter of this litigation is concerned, namely, the *Braughler farm*. He admitted that he had never appraised the value of this property nor had he ever actually been on the land until *after* the condemnation!

Of the other defendant's expert, Ellsworth Walls, the Majority observes: "Walls was a licensed real estate broker who testified that he was acquainted with the appellants' property, the value of properties in the vicinity, and had *handled sales of property in Rayne Township*."* Here, of course, the Majority was taking Walls at his own word, but his word hardly measured up to the gold standard of credibility assigned to it by the Majority. The jury found that most of Walls' testimony contained considerable alloy of incredulity. Walls testified, as the Majority says, that he had handled sales of property in Rayne Township, but under cross-examination he could not name one sale in Rayne Township!

The Majority also says of Walls: "He [Walls] further testified that in February or March of 1950 James

---

* Italics throughout, mine.

Rising from whom the Braughlers purchased their property in October of that year, had placed the property with his concern, known as Walls-Hill Real Estate, consisting of himself and two salesmen, for sale at $6,500; that every effort was made to sell the property at this price by advertising, word of mouth and personal contact with different people . . ." When the Majority Opinion, speaking for the Court, said that Walls had made "every effort to sell the property at this price by advertising, word of mouth and personal contact with different people, it was only quoting Walls' testimony, i.e.: "We made every effort possible, we advertised the property and also by word of mouth and personal contact with different people."

A reading of the record will reveal that Walls' attempt to sell the property was strictly of the armchair-and-slippers variety. He admitted that he did not contact the neighbors of the property he was to sell to ascertain whether they might be interested in its purchase; he admitted that he did not see the Braughlers who afterward actually bought the property; he admitted that he had not spoken to the owner of the property to ascertain if he knew of anyone who wanted to buy the property; he admitted that he could not compare the value of the Rising property to any comparable sale in Rayne Township. The Majority says of Walls' effort to sell the property that "no one was found willing to pay that price for it." This is not extraordinary. On his own statements he made no effort to find anyone who might want to buy the property!

In consistent disparagement of the contentions advanced by the plaintiffs the Majority says: "A loss of water supplied by a spring was claimed." This was not only claimed but proved—to the satisfaction of the jury. Prior to the condemnation, the farm enjoyed the

benefit of a spring which, at an elevation, supplied, through the force of gravity, fresh water for the plaintiffs' needs. In building the highway over the Braughler property, the Department of Highways buried the spring under a fill of 35 feet. The plaintiffs were thus compelled to drill a well which penetrated to a depth of 110 feet (on account of sulphuric subsoil), at a cost to them of $889.92. In addition, the plaintiffs are now required to expend moneys for electric power to pump the water from the well, an expense they did not have before.

It is true the Highways Department attempted to preserve the original spring, as the Majority states, but the attempt was a failure, because, after the job was done, the water became contaminated and unusable. Nor did the Pennsylvania Highways Department make any effort to correct the fault. James H. Ake of the Department testified: "Q. Did you make any provision to get to this spring later on? A. There was no way we could without you would dig down through the side of the pavement. Q. Of course that wouldn't be permissible? A. It would be permissible but wouldn't be feasible; it would cause a slide on the road."

The Majority Opinion says: "Appellant Braughler testified that after the reconstruction, the water was 'not good.' No analysis of the water was offered to support this statement." But one does not need an analysis to detect mud and oil in his dinner glass of drinking water.

The Majority Opinion is to me an enigma. In my view, one of the main purposes of an appellate Court of last resort is to control and direct the great streams of the law into the channels of pragmatic application of the principles of justice. But the Majority Opinion would seem to give to this Court, in this case, a chore of measuring facts and law by the thimbleful, with an

equivocating handling of the thimble, conveying an idea which the record does not warrant. For instance, the Majority says: "It appeared that during the relocation of the road a barrel of oil had upset and Braughler claimed that this made the water oily. It is not clear that he was referring to water from the spring or from another source of water supply which existed on the farm." A reference to the record will show that there can be no doubt that Braughler *was* referring to water from the *spring*: "Q. What happened to *that spring?* A. They built the new road over the top of it. Q. And in building the new road they have indicated they made some attempt to fix it; what did happen? A. The surface water got in it; I made an attempt to use it when they boxed it in, but the surface water and oily water got in it and it was unusable. Q. Are you using it today? A. No, sir. Q. What did you have to do? A. I had to drill a well. . . . Q. You weren't too satisfied with this water supply from *the spring*? A. Previous to the condemnation it was good water, very good water, it was soft water. Q. And from the same place it now not so good? A. It is not good at all; it was not good the last time I used it. Q. Yet it is from *the same spring*? A. *That is right,* but it had been tampered with."

After the statement in the Majority Opinion to the effect that it was not clear what water Braughler was referring to, the Majority says: "However, it was testified that the oily condition was a temporary one which cleared up." Since the Majority was speaking of Braughler in the previous sentence it is to be assumed that it continued to speak of Braughler in the following sentence because there was no indication of a change in the subject person. In point of fact, however, it was not Braughler who testified that the oily condition was a temporary one which cleared up. The

witness who testified to this was James H. Ake, the Highway Department employee. He said: "That was a temporary condition. They drained the machinery above, and they spilled a barrel of oil there, and the oil ran down, and Mr. Rising told me about it, and the water near by there was full of oil; that lasted a couple of weeks." But in this connection it is to be noted that Ake admitted later that he did not examine the spring, so that his testimony, as to whether the oily condition was a temporary or permanent one, becomes utterly worthless: "Q. Did you examine the spring? A. No, I didn't. Q. When Mr. Braughler told you there was oil in it did you not go and examine it? A. That was afterwards. Q. So that you don't know whether the oil got in the spring or not, is that a correct statement? A. That is a correct statement."

And it is to be noted further in this connection that the plaintiff Braughler, who obtained the jury's verdict, testified specifically that the oily condition was *not* a temporary one: "Q. Mr. Braughler, on behalf of the defense it has been testified that the water conditions, the oil in it, was a temporary condition; how long to your knowledge did it continue? A. I drilled the well in October, 1952, which is in the neighborhood of a year after, and there was indications that there was definitely surface water with oily conditions in it at that time. Q. And had that condition been from shortly after the road was constructed up to that time? A. That is right. Q. Where did you get your water during that period? A. We hauled water; we hauled water from Mr. Jim Watson's property for household water. Q. And it was a continuation of that that compelled you to drill a well? A. That is right, under Mr. Handler's suggestion, he said it would clear up shortly, and I went on until October, 1952, and decided I couldn't wait for it forever to clear up, because there

was surface water getting in it. Cross-Examination by Mr. Parnell: Q. As a matter of fact that spring was known as not so good any way for some years? A. On the contrary that spring was known as one of the best."

The Majority says: "We have thoroughly reviewed the record and are convinced that appellants failed to establish that they were damaged with respect to water supply from the spring." The Majority may be convinced, but I respectfully submit it is an arbitrary conviction. Why would the Braughlers, economic modest farmers that they are, spend $889.92 to dig a well if they still had a good water supply from the spring? Why would they continue to spend money for electric power to pump the well, if the spring were functioning, as it was prior to the taking, through the natural power of gravity? Moreover, the jury, the fact-finding tribunal, acknowledged by their verdict the destruction of the spring, and there is nothing in the record to show that the jury acted capriciously.

The Majority Opinion says: "Appellants also claimed damages for a very large number of trees destroyed in the taking. There was no evidence denying that the trees were destroyed, although their value was disputed by the Commonwealth." After so meticulously measuring the testimony of the spring water with a medicine dropper, I do not know why the Majority disposes of the plaintiffs' arboreal loss with this one sweeping statement. The Braughlers lost on their farm, because of the taking, the following trees: 2,000 pine trees in a marketable stage; 28 apple trees, one pear tree, two cherry trees, 10 maple trees, one 36-inch oak, 40 hardwood trees. The Majority says that the value of the trees was disputed by the Commonwealth, but that denial would not deprive the plaintiffs of the value of the trees, after the jury had decided in the plaintiffs' favor.

In harmony with its general derogation of the property-owners' case, the Majority belittles the testimony of the plaintiffs, while lauding the testimony of the Commonwealth, on the subject of the acreage of land lost or damaged. But here again it must be repeated that the plaintiffs in this review are entitled to have the testimony read in the light most favorable to them since the jury awarded them the verdict. That testimony shows that 4½ acres were actually occupied by the new highway, that 1½ acres were rendered useless, that 5 acres became swampland because of excessive drainage and that 20 were made inaccessible. And then there were 5 acres with a 4-foot gully which continued to wash deeper with the passing of time.

Through a process of mathematics which I am unable to follow, the Majority says: "While ordinarily the jury is given wide latitude in arriving at valuations and ascertaining damages, a finding that a farm valued in the market at $6,000 only three months earlier becomes almost worthless when *only a part of it* is taken or damaged leaving a substantial acreage on which the farmhouse, barn and other farm buildings are located, should not be allowed to stand." But it was not only a *part* of the farm that was taken or damaged. *Over one-half* of the farm was taken or damaged. The attorney for the Commonwealth in cross-examining Darhl K. Braughler, summed up the lost and damaged acreage as follows: "Q. Well that is about 30½ acres so that you still have all your buildings and somewhere around 27 to 28 acres undamaged? A. That is right, without water to the dwelling house."

The Majority says: "Assuming arguendo that there was credible evidence in the instant case for the jury to arrive at the subtrahend, that is the value after the taking claimed by appellants, we think the court was fully justified in finding that there was no credible evi-

dence supporting the minuend, that is the value before the taking claimed by appellants."

The error in the Majority's arithmetic here, following the figuring done by the Court below, is that it has taken the highest minuend figures from the Commonwealth's evidence, and the highest subtrahend figures from the plaintiffs' evidence. A mathematical mixture of that character does not spell justice, but confusion.

And so, subtracting the subtrahend of the Majority Opinion from the minuend of the jury's verdict, we come to the remainder that the plaintiffs find themselves in the muddy acres of a swampy *status quo pendente lite,* and I, accordingly, dissent.